

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 69044-2-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CHARLES EUGENE FELD, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant, | ) | |
| | ) | FILED: September 2, 2014 |
| | ) | |

BECKER, J. — This opinion affirms appellant Charles Feld's convictions for attempted murder, assault, arson, and felony harassment, all arising out of a confrontation between Feld and a neighbor at Feld's home on Guemes Island.

Feld and the neighbor, Stephen Callero, got into a dispute over $150. In March 2010, Callero agreed to rent a rototiller for Feld so long as Feld washed it and filled it with gas before Callero had to return it to the rental company. Feld was to reimburse Callero for the $150 rental fee.

Callero testified that when he went to pick up the rototiller, it was covered in mud and empty of fuel, and Feld was not there to pay him. According to Callero, for about a week, Feld kept saying he would pay him the next day. Recordings of Feld's provocative and insulting voice mails were admitted at trial.

Callero went to Feld's home on the evening of April 2, 2010, to confront Feld about getting paid. Callero's co-worker, Tim Hanby, drove him there in

Hanby's truck. They pulled up near Feld's home while Callero's son, who had also come along, remained in his own truck just off the main road. Callero got out of the truck and approached Feld's residence. Feld came out onto the porch "screaming and yelling and cussing." When Callero got within about 20 feet from the house, he asked Feld for reimbursement for the rototiller.

Meanwhile, Hanby got out of his truck carrying a fish club. Feld's wife, Phyllis Feld, testified that Hanby raised the club and said, "I'm going to beat that money out of you, you mother fucker." Feld went inside and returned with a bucket he had previously filled with gasoline and other toxic chemicals. He threw the bucket at Callero. The bucket missed Callero, but its contents hit Hanby in the face and spilled down his front. Feld pulled out a lighter and tried to light Hanby on fire, but the wind kept blowing the flame out.

Callero called 911. Feld threw a large cement flower pot at Callero, hitting him and knocking the cell phone out of his hand. Feld went back into the house and came back out shooting a gun. He fired three shots as Callero ran back to the truck.

Callero testified that Feld followed him to the truck, held the gun about a foot from his face, and pulled the trigger. Callero testified, "I saw my whole life go in front of me," but Feld's gun jammed. Feld then used the butt of the gun to break the window of the truck. He reached inside and tried to pull Callero out of the truck. Hanby hit Feld with the fish club and got him away from Callero.

Feld went back to his house, and Hanby and Callero were able to drive away. They went to a nearby fire station as instructed by the 911 dispatcher.

While there, Callero heard a dispatch call reporting that his house was on fire. His entire property burned to the ground.

Two Skagit County sheriff's deputies went to Feld's house that night. They found only Feld's wife there. Feld called 911 and said that if the deputies did not leave his property within 30 minutes, they would be killed. A shot was fired toward the deputies, and one of them saw the silhouette of someone standing nearby.

The next morning, Feld turned himself in to authorities.

At trial two years later, Feld faced charges of two counts of first degree attempted murder (of Callero and Hanby), four counts of first degree assault (for his actions against Callero, Hanby, and the two deputies), one count of first degree arson, and one count of felony harassment (threat to kill). The jury found Feld guilty on all eight counts and returned special verdicts for firearm enhancements. The court imposed a prison sentence of 866 months. Feld appeals.

*Right to Counsel at Competency Hearing*

Feld contends his convictions must be reversed because the court denied him the right to counsel at a competency hearing.

In the two years Feld awaited trial, his competency to stand trial was the subject of numerous hearings. Defense counsel consistently took the position that Feld was not competent. Feld was ordered to Western State Hospital on May 13, 2010; December 8, 2010; April 7, 2011; and November 17, 2011.

On May 13, 2010, Feld refused to appear in court for his arraignment. In his absence, the court granted the State's motion for a competency evaluation.

On June 10, 2010, Feld was forcibly brought before the court for arraignment. He had to be removed after a verbal outburst. The court found Feld competent to stand trial based on the reports from Western State Hospital. The court entered pleas of not guilty in Feld's absence but with his attorneys present.

On December 3, 2010, another hearing was held. Feld's appointed counsel Wesley Richards asserted that Feld's mental condition had deteriorated since the order finding him competent on June 10, 2010. Richards reported that Feld was refusing to meet with him and had declined antipsychotic medications. After an extensive colloquy with Feld, the court signed an order finding Feld incompetent and returning him to Western State Hospital for treatment and restoration of competency. A status review was scheduled for February 24, 2011, prior to expiration of the 90-day restoration period.

On February 24, 2011, the court held the status review hearing. This is the hearing at which Feld claims he was denied counsel. Based on a report from Western State Hospital, the State asked the court to find Feld competent and to proceed to trial. Feld's attorney, Richards, slid off the road in snowy conditions and was unable to be present for the hearing. Another public defender from the same office appeared and requested a one-week continuance. He said he was uninformed about the case and was not adequately prepared to address the issue of competency. Feld was present and said he wanted to proceed and to go

4

to trial immediately and plead guilty to all charges. The court denied the continuance and found Feld competent based on the report from Western State Hospital. Trial was set for March 2011. Another year went by before the trial actually began.

On March 25, 2011, Feld was interviewed at the jail by defense expert Dr. Kenneth Muscatel. On April 7, 2011, defense counsel Richards secured another order for a determination of competency. The defense motion asserted that due to Richards' absence from the hearing on February 24, 2011, the court had failed to consider the opinions of defense counsel regarding competency and Feld had been denied his right to have an independent mental health expert file a report regarding competency. The court ordered Feld committed to Western State Hospital for more observation and treatment. The order stated that defense counsel and a defense mental health expert were entitled to be present for forensic evaluations.

On July 6, 2011, Feld was released from Western State Hospital. After this, Feld was represented for a time by a different attorney, Lawrence Delay.

On November 17, 2011, Feld was again represented by Richards at a hearing. Upon a defense motion, the court ordered Feld committed again to Western State Hospital for observation. The hospital was directed to submit a report diagnosing Feld's mental condition and providing opinions as to whether he suffered from a mental disease or defect and if so, whether he was competent to stand trial; whether he presented a substantial danger to other persons unless kept in custody; and whether he required medication, taken either voluntarily or

forcibly, to maintain his competency. The case was continued until the reports came back.

When the hospital made its report, the State again asked the court to find Feld competent to stand trial. Defense counsel submitted a brief arguing that Feld's refusal to meet with counsel and his insistence on not raising a defense showed that he was unable to assist with his own defense. The brief asserted that because the court had previously made a finding that Feld was incompetent, the State had the burden of proving that Feld had been restored to competency.

On February 27, 2012, the court held what proved to be the final competency hearing. The prosecutor reminded the court that Feld had been found competent on February 24, 2011. Defense counsel responded that the order of competency had been entered that day in his absence and over his objection. The court said, "Understood. Okay. Thank you, Mr. Richards."

The court heard testimony from an expert witness at Western State Hospital, who opined that Feld's refusal to meet with Richards "was a volitional thing" rather than a symptom of a psychotic process. Dr. Muscatel opined that Feld could not rationally participate in his own defense.

On March 13, 2012, the court entered an order finding Feld competent to stand trial. The court concluded Feld was capable of assisting in his own defense "but at this point in time chooses not to, and chooses to stand on his own defense of, there is no defense because the system is corrupt." The trial began the next month.

Feld's contention is that the absence of Richards from the hearing on February 24 amounted to a complete denial of counsel at a critical stage, warranting automatic reversal under United States v. Cronic, 466 U.S. 648, 658-60, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

Competency hearings are a critical stage to which the Sixth Amendment right to counsel attaches. State v. Heddrick, 166 Wn.2d 898, 910-11, 215 P.3d 201 (2009). But the fact that Feld's primary counsel, Richards, was absent due to inclement weather does not mean that Feld experienced a complete denial of counsel under Cronic. Another attorney from the same office as Richards stood in for him and advocated that the decision be postponed until Richards could be present. The record indicates that the court was concerned about time running out. The absence of Richards at this hearing did not cause a loss of rights, a waiver of defenses, or any other substantial effect on the outcome of the case. The issue of Feld's competency would continue to be litigated for another full year.

Feld argues that the absence of Richards was critical because had Richards been there, he would have held the State to its burden of proving that Feld was incompetent. He claims that having once been found incompetent by the court on December 8, 2010, he was entitled to the presumption that he remained incompetent until the State proved otherwise. Feld relies on State v. P.E.T., 174 Wn. App. 590, 592, 300 P.3d 456 (2013), citing State v. Coley, 171 Wn. App. 177, 187, 286 P.3d 712 (2012). But the Court of Appeals decision in Coley was recently reversed by the Supreme Court in State v. Coley, __ Wn.2d

7

__, 326 P.3d 702 (2014). Under Coley, when an individual has been evaluated as competent after restoration treatment, the burden of proof is on the party challenging competency. Coley, 326 P.3d at 709. Thus at the hearing on February 24, 2011, and thereafter, Feld was not entitled to a presumption of incompetence. We conclude the absence of Feld's primary defense counsel at one of numerous hearings at which his competency was addressed does not, under these circumstances, entitle him to reversal of his convictions.

*Shackling*

The trial court ordered Feld to wear ankle shackles during the first three days of the trial. Feld contends the shackling violated his rights under the Fourteenth Amendment and article I, section 22 of the Washington Constitution.

A defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances. State v. Finch, 137 Wn.2d 792, 842, 975 P.2d 967, cert. denied, 528 U.S. 922 (1999); State v. Hartzog, 96 Wn.2d 383, 635 P.2d 694 (1981). Whether restraints are necessary is a question that must be given close judicial scrutiny. Finch, 137 Wn.2d at 846. However, a trial court has discretion to determine the best way to handle each particular situation.

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.

Illinois v. Allen, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (affirming where judge exercised discretion to remove an obstreperous defendant rather than having him sit in the courtroom bound and gagged).

A trial court may not adopt a broad general policy to impose physical restraints upon potentially dangerous inmates and must instead exercise discretion "founded upon a factual basis set forth in the record." Hartzog, 96 Wn.2d at 400. It is an abuse of discretion to order physical restraints unless the decision is based on evidence that "the defendant poses an imminent risk of escape, that the defendant intends to injure someone in the courtroom, or that the defendant cannot behave in an orderly manner while in the courtroom." Finch, 137 Wn.2d at 850.

During the two years that Feld went back and forth between the jail and Western State Hospital, hearings were held that Feld usually did not want to attend. When he did attend, he often did not behave in an orderly manner. Appellate counsel unduly minimizes Feld's conduct by saying that he sometimes "spoke out of turn and ignored the court's request for silence." Brief of Appellant at 9. On May 13, 2010, Feld was scheduled for arraignment and a hearing on whether he should be sent to Western State Hospital for evaluation. The court found that bringing Feld into court "would require nothing short of a full-fledged wrestling match where there would be a high possibility someone could be injured." Feld was brought into court but soon had to be physically removed. The court put on the record the following description:

Mr. Feld was brought down to the court today for the signing of the competency or formal arraignment. He was brought down at approximately 1:20 or so. Upon arriving in the courtroom Mr. Feld commenced a loud and boisterous outburst, screaming at the Court, the Prosecutor, the general public, at everyone involved with the court staff. When asked to cease and [desist] he only got louder. The Court had him removed from the courtroom and had Mr. Feld's attorney, Mr. Tyne, go back and ask Mr. Feld if he would stand quiet so we can proceed with the arraignment. Mr. Feld replied with further and even louder outbursts and attacks against the system, and the Court, and the State, and the Prosecutor, and so on. When brought back into court Mr. Feld gathered steam as far as his outbursts were concerned so the Court had him removed again. He was taken back up to the jail. Approximately 15 minutes later he was brought back into court and asked once again to remain civil so the proceedings could take place. And Mr. Feld responded by another loud and boisterous outburst disrupting the court proceedings, making it absolutely impossible to get anything said, done, or heard over the top of this ranting and screaming in the court.

In later hearings, Feld repeatedly called the judges before whom he appeared some variation of "black-robed whore of Lucifer" and told them and his attorneys that they should kill themselves. His tirades contained violent language—e.g., "I was groomed to assassinate men, women, children anywhere on this earth." "Kill yourself, you God damned whore."

The jail staff gave unrebutted testimony that when Feld did not want to attend a hearing, he was so combative it would take total restraints to get him into the courtroom. There was general agreement, including by defense counsel, that bringing Feld into the courtroom in restraints posed a high risk of injury that should be avoided by leaving him in the jail to the extent possible.

On April 10, 2012, the trial was about to begin. The State submitted a motion asking the court to consider shackling Feld as a courtroom security

10

measure or at least to consider minimal restraints. The motion was based in part on Feld's frequent references to the deaths awaiting his attorneys and the judge. The State's brief said, "While it is true the threats are usually in the form of 'Go kill yourself,' it cannot be overstated the number of times the threats have been made, nor the passion behind the threats." The brief also asserted that Feld's outbursts were a matter of concern because he did not just make "inappropriate comments" but was "physically demonstrative." The brief observed that throughout the pretrial process, Feld had "at different times physically taken steps toward the Judge or stood up, and but for restraints would be difficult to control, according to jail staff." Defense counsel opposed the motion.

A hearing on the motion occurred shortly before the beginning of voir dire on Wednesday, April 11, 2012. The parties first discussed Feld's announcement that he would refuse to wear civilian clothes during the trial. Defense counsel pointed out that jail garb is prejudicial because it "strips away the presumption of innocence. And in my mind, it is further evidence that Mr. Feld is not making rational decisions in this case, and is not able to assist rationally in his defense." Defense counsel opposed the State's request for shackles, suggesting additional security as an alternative. "As the court is aware, convictions have been overturned by appellate courts in this state because jurors have seen defendants in shackles." Defense counsel's preference that Feld be medicated was also discussed, but counsel conceded that the only way to get Feld to take medication against his will was to send him back to Western State Hospital for another

11

competency evaluation. The State argued that some form of restraint was a better alternative than removing Feld from the courtroom.

The court warned that outbursts would be dealt with by removing Feld from the courtroom. The court remarked that if Feld was going to insist on appearing in court in jail garb, shackling was "not quite as big an issue." Sergeant Ron Coakley of the jail staff testified in support of the use of restraints because of his concern that Feld "tends to lose control" and might, in the midst of a verbal tirade, do physical harm to his attorneys or the judge or court staff. Defense counsel again objected that shackling was highly prejudicial, even more so than jail clothing. Counsel also stressed that Feld had never tried to attack him and stated his opinion that Feld "has bark but no bite." At the end of the hearing, the court said, "Okay. Well, we will see what we're going to do once we see what Mr. Feld is going to wear. That will make a difference."

When the trial began, Feld chose to wear jail clothing in the courtroom against the advice of counsel. The court instructed the jailers to unshackle Feld's hands and waist but to let the ankle shackles remain. The court put on the record the reasons for requiring ankle shackles:

> [THE COURT:] I did instruct the jailers to unshackle Mr. Feld's hands and remove the waistband so that Mr. Feld can assist in his defense with his hands, should he want to pass notes to his attorneys.
> I left the shackles on the feet due to the fact that Mr. Feld decided to wear the red suit, so it is no great mystery to the jury that Mr. Feld is in custody, since he's dressed in the jail garb. And based on the testimony of Sergeant Coakley this morning, there are some concerns, the Court has some concerns due to some of Mr. Feld's outbursts.

> And the Court, on previous occasions, and due to the nature and extent of the charges, and due to the nature and extent of some of Mr. Feld's threats in the course of this case, felt that it was, upon balancing, appropriate to leave Mr. Feld shackled at the feet for security purposes.
>
> We are in a small courtroom in comparison to the one we normally use, and quarters are tight in this particular courtroom. On balance, I feel that this is the appropriate thing to do at this point.
>
> . . . .
>
> . . . Mr. Feld appears to be an athletic individual, and for that reason I felt that, upon balancing, that prudence would dictate the shackles on the legs.

Although measures were taken to make it difficult for jurors to notice the shackles, during voir dire a juror mentioned seeing them. Defense counsel was making the point that Feld was presumed innocent and said, "Now, as Mr. Feld sits here before you today, the way that he's dressed, does that have any impact on your opinion of him?" A potential juror responded, "Well, you can obviously tell that he's been incarcerated because he is in the wardrobe, and he's also got handcuffs around his ankles."

Feld wore the jail garb and the ankle shackles through jury selection, opening statements, and the testimony of the State's first witnesses. When trial resumed on Monday, April 16, 2012, Feld was wearing street clothing and was no longer wearing shackles. There was no more shackling during the rest of the trial, which continued through closing arguments on Thursday, April 19, 2012. The jury began its deliberations the next morning and delivered the verdict just after 5 p.m. on Friday, April 20, 2012.

Feld contends the record is insufficient to show that he was a security risk. Feld also argues that the court abused its discretion by linking the decision to shackle to his decision to wear the red jail uniform.

We agree that a defendant's decision to wear jail garb in the courtroom does not, in itself, eliminate the prejudice inherent in shackling. We also recognize that the problem of defendants who scream and shout in court is not so unusual or threatening that trial judges will always be justified in resorting to shackling to deal with it. And it is well established that a court may not rely solely on the judgment of correctional officers who believe the use of restraints at a trial is necessary to maintain security if the record contains no other justifiable basis for restraints. Finch, 137 Wn.2d at 853.

However, Feld's disorderly conduct was exceptional. And the possibility that he would become assaultive in the courtroom was not an abstract proposition suggested by correctional officers. It is well documented that when Feld did not want to be present in court, he resisted physically. On more than one occasion, defense counsel urged the court to leave Feld in his cell during hearings rather than risk injury to Feld or the jail staff. Just two weeks before trial, on March 27, 2012, Feld was removed from the courtroom because of an outburst which concluded with his statement that he was "not going to sit and say nothing when corruption continues to go on in this nation." The court noted in the record Feld's "inability to control himself and sit quietly to allow us to conduct the hearing."

To argue that the trial court abused its discretion, Feld cites Finch and In re Personal Restraint of Davis, 152 Wn.2d 647, 101 P.3d 1 (2004). Both of these were aggravated murder cases where the Supreme Court found the use of shackles throughout the entire proceedings was not justified. In Finch, the trial court ordered the defendant to remain in shackles throughout the entire proceeding. While the defendant's estranged wife and her mother were testifying, the trial court ordered the additional restraint of having the defendant's right hand handcuffed to a chair and the shackles handcuffed to a table leg. Our Supreme Court found the trial court had not stated an adequate justification for the leg shackling and had failed to consider less restrictive alternatives for the hand shackling. Finch, 137 Wn.2d at 853-84. This error was deemed harmless in the guilt phase but not in the penalty phase. Finch, 137 Wn.2d at 862, 866; see also Davis, 152 Wn.2d at 700-05.

Feld argues that if a manifest need for restraints was absent in Finch and Davis, it was necessarily absent in his case as well. Feld overlooks significant distinctions. In Finch, the defendant was never disruptive in court and he "attended numerous pretrial proceedings in which he was completely compliant with the decorum of the court." Finch, 137 Wn.2d at 852. In contrast, Feld's outbursts during pretrial hearings presented a constant challenge to the decorum of the court. In Finch, the shackling decision was based primarily on the fact that the defendant had threatened his wife—and his wife was not in the courtroom for the entire trial. Finch, 137 Wn.2d at 851. While Feld did not personally threaten to harm anyone, he persistently exhorted his attorneys and the judge to kill

15

themselves. The judge was entitled to factor these violent comments into his decision.

Another important distinction is that unlike in Finch and Davis, the shackling of Feld did not last throughout the proceedings. This was an important consideration in State v. Clark, 143 Wn.2d 731, 24 P.3d 1006, cert. denied, 534 U.S. 1000 (2001). In Clark, the trial court erred by ordering shackles in an aggravated murder case without an individualized assessment of the need for shackling, and where there was no reason to fear violence or escape and no evidence "of anything other than decorous behavior during pretrial hearings." Clark, 143 Wn.2d at 774. But the court judged the error harmless because the defendant was shackled only during the first day of voir dire and on the day the verdict was returned. "Because the impact of shackling on the presumption of innocence is the overarching constitutional concern, it would logically follow that in the minds of the jurors Clark's shackling on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles." Clark, 143 Wn.2d at 776. The same is true here. Because Feld had sometimes been in court without causing disruption, the trial court chose a course of action that allowed Feld to show he was capable of sitting quietly and civilly in court. When Feld demonstrated throughout three days that he would comply with courtroom decorum and refrain from making a spectacle of himself and a circus out of the trial, the court responded to the changed behavior by lifting the shackling order. This approach may well have prevented a physical outburst of the type Feld had recently promised ("I am not going to sit and say

16

nothing.") Such an outburst would have resulted in the jail staff having to restrain and remove Feld in front of the jury, an event that would have been extremely prejudicial.

The court did not order shackling as a routine matter without considering alternatives. Defense counsel proposed the alternative of increasing the number of officers present. But it is not unreasonable to conclude that minimal and covered-up shackles are less prejudicial than "packing the courtroom with bailiffs." Jones v. Meyer, 899 F.2d 883, 884-86 (9th Cir.), cert. denied, 498 U.S. 832 (1990). The court balanced defense counsel's preference to allow Feld to remain unshackled against the State's proposal to have him fully shackled. The court did not rely on a general practice or defer to correctional officers, but instead made an individualized determination based on long familiarity with Feld. It would be difficult to say that there was an abuse of discretion under these circumstances.

Even if there was a violation of Feld's constitutional rights, the constitutional harmless error standard applies. Finch, 137 Wn.2d at 859-61. The evidence against Feld was overwhelming. We are satisfied beyond a reasonable doubt that any reasonable jury would have reached the same result if there had been no shackles. The brief glimpses the jurors had of Feld's shackles at the beginning of the trial, when he was also voluntarily in jail garb, did not contribute to the verdict. See Wilson v. McCarthy, 770 F.2d 1482, 1486 (9th Cir. 1985).

*Exclusion of Testimony About Victim's Prior Act*

During the State's case, Hanby testified that Callero was a "gentle, mild-mannered, kind of passive . . . he's not a wimp, but he's real soft spoken, not aggressive at all kind of guy."

Feld characterized this as "character evidence" of Callero's peaceful character. He argued that Hanby's testimony opened the door to testimony that Callero was, in fact, aggressive. Feld proposed to have his wife testify that she once saw Callero take a baseball bat to confront someone. Feld's offer of proof anticipated his wife would testify that she had told him about the incident with the baseball bat, and that they had also discussed Callero's "violent tendencies or his threatening behavior to others." Feld argued that his wife's testimony about this incident would not only serve as character evidence in rebuttal to Hanby's remark, it would also be relevant to his claim that he acted in lawful self-defense, in that it would tend to show Feld had a reasonable fear for his safety or his wife's.

The court refused to admit the offered testimony of Mrs. Feld about the baseball bat incident. Feld assigns error to this decision. We review de novo his claim that excluding the testimony violated his Sixth Amendment right to present a defense. See State v. Jones, 168 Wn.2d 713, 719-20, 230 P.3d 576 (2010).

A defendant's right to offer testimony in his own defense is constitutionally guaranteed, but it must be of at least minimal relevance. Jones, 168 Wn.2d at 720. As character evidence, the proffered testimony was irrelevant. In proving the character of an alleged victim, specific acts of violence may not be shown.

18

State v. Adamo, 120 Wash. 268, 270, 207 P. 7 (1922). And to the extent Hanby's remark opened the door to character evidence, the trial court properly deemed the baseball bat testimony to be unnecessarily cumulative. As the trial court observed, the evidence before the jury already included a number of statements Feld had given to law enforcement officers characterizing Callero as "a drunken, drug-addicted bully, who has bullied people on the island for a long time."

Feld asserts Mrs. Feld's testimony should have been admitted as relevant to self-defense. The trial court instructed the jury on self-defense. The parties argued in closing about whether the State had proved the absence of self-defense. The State argued in part that Feld did not have a reasonable fear that he was in danger and that the actions he took were not reasonable under the circumstances. Feld contends his knowledge of the prior incident in which Callero allegedly confronted someone with a baseball bat was important to show that he had a reasonable fear that he was in danger when Callero approached his house.

At least in cases where a defendant is charged with homicide, the general rule is that the testimony of third persons may be admitted to show that they had quarrels with the deceased

> and show the conduct of the deceased on those occasions, if such prior occurrence or occurrences were made known to the defendant before the commission of the crime for which he is being tried, because such testimony tends to show the state of mind of the defendant at the time of the killing, and to indicate whether he, at that time, had reason to fear bodily harm.

Adamo, 120 Wash. at 269. Feld's proposed application of the rule stated in Adamo assumes that it broadly encompasses cases of assault as well as homicide, and cases where the third party witness is not the person who had the previous quarrel with the defendant. Even assuming that to be so, there was no showing that the baseball bat incident was recent enough to be relevant. A defendant is permitted to show "specific acts of the deceased which are not too remote." Adamo, 120 Wash. at 271. Feld's offer of proof did not indicate when the baseball bat incident occurred.

The trial court was entitled to conclude that the occurrence connected with the offer of proof was not within the parameters of relevance established in Adamo. The exclusion of Feld's wife's testimony did not violate Feld's Sixth Amendment right to present a defense.

*Jail Phone Recordings*

Feld moved unsuccessfully to suppress jail recordings of his phone conversations with his wife as violating his privacy rights under article I, section 7. The trial court denied the motion, and the recordings were played for the jury. Feld assigns error to this ruling. As Feld acknowledges, his argument fails under State v. Archie, 148 Wn. App. 198, 199 P.3d 1005, review denied, 166 Wn.2d 1016 (2009), and State v. Haq, 166 Wn. App. 221, 268 P.3d 997, review denied, 174 Wn.2d 1004 (2012).

*To-convict Instructions and Self-defense*

The to-convict instructions given to the jury for counts one through four did not include language about self-defense. Self-defense was covered in separate instructions.

Feld contends that self-defense should have been included in the to-convict instructions, as he proposed below. He contends the failure to do so is reversible error because the absence of self-defense is an essential element that the State had the burden of proving under State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997).

Feld's argument is foreclosed by State v. Hoffman, 116 Wn.2d 51, 109, 804 P.2d 577 (1991), in which the court rejected the same argument. Feld argues that Hoffman has been "abrogated" by Smith and other cases. The Supreme Court, though, has never said so. Following Hoffman, we conclude the mode of instruction was satisfactory.

*Reasonable Doubt Instruction*

Feld contends the trial court erred by including the optional "abiding belief" sentence of WPIC 4.01 in its reasonable doubt instruction, over Feld's objection. We reject this argument, following State v. Fedorov, ___ Wn. App. ___, 324 P.3d 784, 790 (2014).

*Double Jeopardy*

Feld contends his right to be free from double jeopardy was violated by the judgment convicting him for first degree assault and attempted murder of Callero based on the same course of conduct. The State agrees and concedes

21

that both assault convictions (counts two and four, involving Callero and Hanby respectively) should be vacated to avoid double jeopardy. We accept the concession. In re Personal Restraint of Orange, 152 Wn.2d 795, 820, 100 P.3d 291 (2004). The judgment is remanded with orders to vacate the two assault convictions. Because Feld's sentence will remain unchanged, resentencing is unnecessary.

With the exception of the remand that is necessary to correct the judgment by vacating the two assault convictions, the judgment is affirmed.

Becker, J.

WE CONCUR:

Spearman, C.J.

Jau, J.

22